

FILED

May 18 2026, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Jennifer Lynn Goetz,

*Appellant/Cross-Appellee-Respondent*

v.

James L. Goetz,

*Appellee/Cross-Appellant-Petitioner*

---

May 18, 2026

Court of Appeals Case No.
25A-DC-2101

Appeal from the Hendricks Superior Court

The Honorable Mark A. Smith, Judge

Trial Court Cause No.
32D04-2105-DC-330

---

**Opinion by Judge Vaidik**
Judges Bailey and Scheele concur.

**Vaidik, Judge.**

## Case Summary

[1] Jennifer Lynn Goetz ("Mother") and James L. Goetz ("Father") had four children together before divorcing in 2022. In this high-conflict post-dissolution proceeding, Mother appeals the trial court's denial of her motion to modify school placement, calculation of Father's income for purposes of modifying his child-support obligation, denial of her request for attorney's fees, and finding that she was in contempt. Father cross-appeals, arguing that the trial court erred in denying his request for sole legal custody as to educational decisions and instead ordering joint legal custody.

[2] We affirm as to Mother's claims. But because Mother and Father have made the children's schooling a battleground, an award of joint legal custody as to educational decisions imposes an intolerable situation upon Mother and Father and is therefore not in the children's best interests. Thus, we reverse the order of joint legal custody as to educational decisions only and remand for the trial court to award Father sole legal custody as to educational decisions.

## Facts and Procedural History

[3] Mother and Father married in 2011 and have four children: S.G., born in April 2012; P.G., born in December 2013; L.G., born in June 2016; and G.G., born in December 2018. S.G., P.G., and L.G. have all been diagnosed with dyslexia and ADHD. During the marriage, Mother homeschooled the children once they reached school age. After Father filed for divorce in May 2021, Mother

and Father disagreed about whether S.G., P.G., and L.G. should attend public or private school for the 2021-2022 school year (G.G. was not yet school age). At the time, Mother worked as an aide in the Avon Community School Corporation, which is the district the family lived in, and she wanted to enroll the children there. Ultimately, S.G., P.G., and L.G. began attending public school in Avon that fall. All three children "started significantly below grade level." Tr. Vol. 2 p. 164.

[4] In April 2022, the trial court issued a decree of dissolution awarding Mother primary physical custody and the marital home in Avon. The court awarded Mother sole legal custody with the limitation that "[t]he children shall remain in public school at the Avon Community School Corporation." Appellant's App. Vol. 2 p. 45. At the time of the decree, Father worked for Biggby Coffee as an area developer and also owned a share of a Biggby Coffee franchise. The court ordered Father to pay $213 a week in child support and to maintain health insurance for the children. The order also provided that the parties would split the costs of tutoring and extracurricular activities according to income shares (Father would pay 73% and Mother would pay 27%) and that Mother would pay the first 6% of annual uninsured medical expenses, with the rest to be split based on income shares.

[5] In March 2024, Mother, pro se, filed a "Motion for Relief from Judgment" requesting that the trial court vacate the provision of the dissolution decree requiring the children to remain in Avon public schools. *Id.* at 114 (capitalization omitted). She asserted that Avon schools weren't meeting the

children's educational needs. By that time, Mother was no longer working as an aide. Father opposed the motion, and then in April, he filed a motion for rule to show cause, alleging that "Mother has involved all of the girls in the dispute about their school choice." *Id.* at 181. Father, who was living in Plainfield, wanted Mother to consider keeping the children at the same school. Mother filed her own motion for rule to show cause including a myriad of allegations against Father. The court set a hearing on the motions for November and reappointed guardian ad litem (GAL) Betty Harrington, who'd served as GAL while the dissolution was pending.

[6] In her report, GAL Harrington explained that although S.G., P.G., and L.G. had academic challenges, especially with reading, they'd made significant progress since entering public school. GAL Harrington noted that Mother had shared her negative opinions about Avon schools with the children and that the children "have been placed in the middle of an adult decision." Appellee's App. Vol. 2 p. 79. She recommended that "Mother should not be permitted to move the Girls from their current schools within Avon." *Id.* at 80. At the time of the report, G.G. was five years old and was supposed to be starting kindergarten in the fall, but Mother later decided "she did not want [G.G.] to begin school in 2024." Appellant's App. Vol. 3 p. 60.

[7] Mother hired counsel and, a week before the November hearing, filed an amended motion for rule to show cause and another motion to modify the requirement that the children attend Avon public schools. This time, she claimed she could no longer afford to live in the marital home and wanted to

move out of Avon, which would affect the children's eligibility to attend Avon schools because Father doesn't live there. Father opposed Mother's motion, arguing that it was an improper notice of relocation and "request[ing] that the court review and, if appropriate, modify the current custody, parenting time, and child support order." Appellee's App. Vol. 2 p. 104.

[8] At the November 7 hearing, Mother withdrew her request to modify the requirement that the children attend Avon public schools. *See* Appellant's App. Vol. 2 p. 31. In its order on the hearing, the court reset the matter for a hearing on January 17, 2025, and noted that because Mother hadn't filed a formal notice of relocation, it didn't intend to hear issues of relocation at the next hearing. The court also ordered Mother and Father "not to have any discussions with [the] children regarding the pending motions, school choice, custody, parenting time or other adult matters related to the ongoing issues in this case." Appellee's App. Vol. 2 p. 111.

[9] Mother filed a notice of intent to relocate in December stating that she'd sold the marital home in Avon and was moving to the Washington Township school district in Indianapolis. The day after filing the notice, Mother's attorney emailed Father's attorney that Mother "is looking into schools in Washington Township." *Id.* at 128. Father moved for a temporary injunction prohibiting Mother from unenrolling the children from Avon schools and again requested that "[a]fter [a] hearing, the Court permanently modify Mother's custody/parenting time." *Id.* at 120. Mother moved into her new home in Indianapolis on January 5. Around that time, Mother took the children to a

Washington Township school with the intention of enrolling them, but the school was closed that day.

[10] The parties addressed Father's motion for an injunction at the January 17, 2025 hearing. After the hearing, the trial court issued a preliminary injunction prohibiting Mother from unenrolling the children from Avon schools or enrolling them in any other school district until a final hearing on the merits. The court again admonished Mother and Father "not to have any discussions with [the] children regarding the pending motions, school choice, custody, parenting time or other adult matters related to the ongoing issues in this case." Appellant's App. Vol. 3 p. 31.

[11] In February 2025, Father filed a notice of intent to relocate, explaining that he planned to move to a home in the Avon school district so the children could remain enrolled there. He also asked the court to "modify the parties' custody and parenting plan as needed." *Id.* at 33. Mother obtained new counsel and filed another motion to modify the dissolution decree's requirement that the children remain in Avon public schools. She also filed another motion for rule to show cause alleging that Father wasn't maintaining adequate health insurance for the children and wasn't paying his share of their uninsured medical expenses or the costs of their extracurricular activities and camps. Mother explained that she had to take out secondary insurance plans to provide coverage for the children, so she asked the court to modify child support to reflect the insurance costs. The court scheduled a hearing on all pending motions for July.

[12]     GAL Harrington submitted a supplemental report in May. She explained that "Mother has created difficult relationships with teachers and staff at [Avon Community School Corporation]" which "cannot be repaired." *Id.* at 72. For example, Mother was confrontational with teachers and front-office staff at S.G.'s school, and P.G. and L.G.'s school had to implement a communication plan whereby all communications from Mother are forwarded to the principal. Additionally, Mother "requested accommodations for [S.G.] but then does not want [S.G.] to use them," questioned the credentials of the teachers at P.G. and L.G.'s school, and accused the school of falsifying records related to the children's progress. *Id*. at 47. GAL Harrington explained that these actions "demonstrate[] to the Children [Mother's] disapproval of their schools." *Id.* at 72. She found that Mother and Father can't make joint decisions about the children's education and accordingly recommended that Mother not participate in school-related decisions, Father be awarded sole legal custody with respect to education, and the children remain in Avon public schools.

[13]     At the July 2025 hearing, GAL Harrington reiterated that Father should be awarded sole legal custody over educational decisions and recommended joint legal custody as to all other matters, possibly with the help of a parenting coordinator. She testified that the children were adjusted to both Mother's and Father's new homes. She opined that Mother "thwarts the efforts" of the children's schools; for example, she doesn't make the children do their homework because "[s]he doesn't believe in homework." Tr. Vol. 2 p. 17. GAL Harrington explained that the children "are very involved in knowing what's

happening in the education realm," "they talk about how they're at the wrong school, and they know that [Mother] is trying to get them out of Avon." *Id.* at 21. Additionally, she opined that it was "absolutely the incorrect decision" not to enroll G.G. in kindergarten for the 2024-2025 school year because being the oldest student in her class will "have such a psychological impact on her." *Id.* at 25. During its questioning of GAL Harrington, the court remarked:

> [I]f we were educating Judges about how to make decisions about joint legal custody, the Goetz[es] would not be a case that we would refer people to and look and say, hey, this is [a] successful co-parenting arrangement. It's never been. There's so much history here of distrust, distaste, dislike. Any decision with regard to joint legal custody to me seems a[nti]thetical to what joint legal custody is about in this case.

*Id.* at 36. The court also commented that a "parenting coordinat[or] works in just a very small percentage of cases. . . . And it usually works in cases where parties are willing to change, because you have to have a heart change before there's a head change. And I see no heart change here." *Id.* at 36-37.

[14] Mother presented evidence of S.G.'s, P.G.'s, and L.G.'s testing and proficiency scores, which had fluctuated over their years at Avon schools. But Susan Hurt, the Special Education Director for Avon Community School Corporation, testified that overall, the children have "made great strides" given that they started significantly below grade level, and they can perform at grade level with accommodations. *Id.* at 164. She explained that S.G. started below proficiency in reading and math but was above proficiency in both by 2024, P.G. was above

proficiency in both reading and math by the winter of the 2024-2025 school year, and L.G. started below proficiency in reading but was approaching proficiency by the winter of 2024-2025 and was above proficiency in math. Hurt noted that although G.G. wasn't yet enrolled, she had a service plan and could seek speech services through Avon. Hurt also testified that S.G.'s, P.G.'s, and L.G.'s teachers have reported that they are respectful, have friends, and get along with other students. She explained that research shows that changing school systems can disrupt children's learning and progress. She testified that Father had been collaborative with the children's schools and that she believed she could work with him to continue implementing services for the children, but she couldn't say the same for Mother. Hurt noted that Avon had offered to provide summer sessions with a special-education teacher for S.G., P.G., and L.G. to prevent them from "slip[ping]" during summer break, but Mother declined. *Id.* at 175.

[15] Mother submitted a child-support worksheet proposing an obligation of $575 for Father. She used $4,480.77 as Father's weekly gross income, but she didn't explain how she arrived at this amount or provide any supporting documentation. Mother denied making negative comments to the children about Avon schools but said she'd told them to "not be down on themselves because of the lack of appropriate interventions." *Id.* at 224.

[16] Father requested sole legal custody related to educational decisions and joint legal custody as to all other matters. By that time, Father was no longer a Biggby Coffee franchisee and was working solely as an area developer. Father's

proposed child-support obligation worksheet listed his weekly gross income as $2,466.09, and he provided an income summary and supporting documentation. Father's 2024 tax return showed a gross income of $233,773, but he explained that his "income was inflated" for that year because he'd sold a business interest in 2024, so the income amount included the proceeds from the sale. Tr. Vol. 3 p. 89.

[17] In August 2025, the trial court issued an order (1) denying Mother's request to remove the children from Avon schools; (2) denying Father's request for sole legal custody as to educational decisions and instead ordering joint legal custody on all matters; (3) appointing a parenting coordinator and ordering the parties to split the costs evenly; (4) modifying Father's child-support obligation to $336 per week based on an annual income of $128,232 (weekly gross income of $2,466 x 52 weeks), but ordering that if Father's annual gross income exceeds $128,232, he shall pay Mother 24% of the excess; (5) ordering Father to reimburse Mother for his share of uninsured medical expenses but declining to find Father in contempt because there was no evidence of a request by Mother for the correct reimbursement amount; (6) finding Mother in contempt for involving the children in the school-choice dispute; (7) ordering the parties to split uninsured medical expenses and tutoring costs according to income shares; (8) capping Father's annual contribution for camps and extracurricular activities at $1,500; and (9) ordering the parties to pay their own attorney's fees. After Father filed a motion to reconsider, the trial court amended the order as to child support. In light of Father's irregular earnings, the court found that his support

obligation "would be more accurate if the parties reviewed the amount [of his income] each year," so it ordered that "an annual 'true up' be performed to accurately reflect the exact amount of child support Father should pay." Appellant's App. Vol. 3 p. 121.

[18] Mother, now pro se, appeals, and Father cross-appeals.

# Discussion and Decision

[19] Mother appeals the trial court's rulings on school placement, child support, attorney's fees, and contempt, and Father appeals the court's award of joint legal custody. We address each challenge in turn.

## I. Mother's Appeal

### A. The trial court did not abuse its discretion in denying Mother's request to modify the children's school placement

[20] Mother first argues that the trial court erred in denying her motion to modify the children's school placement. The parties' dissolution decree awarded Mother sole legal custody but included the limitation that the children remain in Avon public schools. Thus, in moving to modify this requirement of the dissolution decree, Mother was requesting modification of a child-custody order.[1] We review a trial court's ruling on custody modification only for an

---

[1] Mother frames this argument as a challenge to the trial court's ruling on her relocation request and contends that the relocation statutes (Indiana Code chapter 31-17-2.2) govern our analysis. But the trial court didn't deny Mother's relocation request; it allowed her to relocate with the children (which she'd already done) but denied her motion to modify the dissolution decree to remove the requirement that the children remain in

abuse of discretion. *McDaniel v. McDaniel*, 150 N.E.3d 282, 288 (Ind. Ct. App. 2020), *trans. denied*. We do not reweigh the evidence or reassess witness credibility, and we view the evidence most favorably to the judgment. *Id.*

[21] A trial court may not modify a child-custody order unless the moving party shows that (1) modification is in the best interests of the child and (2) there is a substantial change in one or more of the factors that the court may consider in originally determining custody. Ind. Code § 31-17-2-21(a). As relevant here, those factors include the parents' wishes, the child's "interaction and interrelationship" with the parents and others, the child's adjustment to their school and community, and the mental and physical health of all involved. I.C. § 31-17-2-8.

[22] Here, Mother sought to modify the dissolution decree to allow her to remove the children from Avon schools, while Father wished to keep the children enrolled there. GAL Harrington testified that the children are adjusted to both Mother's and Father's homes. Hurt, Avon's Special Education Director, testified that S.G., P.G., and L.G. are respectful, have friends, and get along with other students and that research shows that changing school systems can disrupt children's learning and progress. Although S.G.'s, P.G.'s, and L.G.'s testing and proficiency scores fluctuated throughout their years at Avon schools and they still had some challenges with reading, they've "made great strides"

Avon public schools. Accordingly, Indiana Code section 31-17-2-21, which governs modification of a child-custody order, is the applicable statute.

overall, especially given that they started significantly below grade level after coming from homeschool. Hurt testified that they can perform at grade level with accommodations. By the 2024-2025 school year, S.G. and P.G. were both above proficiency in reading and math, and L.G. was approaching proficiency in reading and above proficiency in math.

[23] Although the children made comments that "they're at the wrong school," GAL Harrington opined that "the children have been influenced by Mom's perspective." Tr. Vol. 2 pp. 21, 24. Indeed, many of the issues with Avon schools appear to have stemmed from Mother's actions. Mother was confrontational with teachers and front-office staff at S.G.'s school, and P.G. and L.G.'s school had to implement a communication plan due to excessive emails from Mother. As GAL Harrington explained, Mother "thwarts the efforts" of the children's schools—she "requested accommodations for [S.G.] but then does not want [S.G.] to use them," questioned the credentials of the teachers at P.G. and L.G.'s school, accused the school of falsifying records related to the children's progress, declined Avon's offer to provide summer sessions with a special-education teacher, and doesn't make the children do their homework because she doesn't believe in homework. Despite Mother thwarting Avon's efforts, S.G., P.G., and L.G. have made academic progress overall. As the trial court concluded, "[w]hile arguably not perfect in their implementation, the strategies employed" by Avon schools "have resulted in successful outcomes, despite the continued resistance from Mother." Appellant's App. Vol. 3 p. 107.

Mother has failed to show that it is in the children's best interests to modify the requirement that they remain in Avon public schools. The trial court did not abuse its discretion in denying Mother's request to modify school placement.

## B. The trial court did not err in determining Father's income for purposes of calculating child support

Mother next argues that the trial court erred in calculating Father's income for purposes of modifying his child-support obligation. A trial court's calculation of child support is presumptively valid, and we will set aside the modification of a support obligation only if it is clearly erroneous. *Bogner v. Bogner*, 29 N.E.3d 733, 738 (Ind. 2015). In reviewing a modification order, we consider only the evidence and reasonable inferences favorable to the judgment. *Id.* The Indiana Child Support Guidelines recognize that "[t]here are numerous forms of income that are irregular or nonguaranteed," and "[c]are should be taken to set support based on dependable income." Ind. Child Support Guideline 3(A), cmt. (2)(b). "When the court determines that it is not appropriate to include irregular income in the determination of the child support obligation, the court should express its reasons." *Id.*

In calculating Father's support obligation, the trial court used a weekly gross income of $2,466 for Father, which amounts to an annual income of $128,232. Mother contends that the trial court erred by excluding from Father's gross income the proceeds from the 2024 sale of his business interest because it didn't make a "finding that the 2024 proceeds were truly one-time," and Father "produced no . . . documentation to substantiate his claim that these proceeds

are non-recurring." Appellant's Br. pp. 46, 47-48. Although the court acknowledged that Father's 2024 tax return reflected a gross income of $233,773, it accepted Father's testimony that this amount "was inflated and an outlier" due to the sale of his business interest. Appellant's App. Vol. 3 pp. 105-06. In other words, the court found that the proceeds from the sale weren't dependable income. And Father's documentation supports the use of $128,232 as his annual income. His income summary and paystubs show that he was earning this amount at the time of the hearing, and his testimony that his income was inflated in 2024 substantiates that his gross income is $128,232, not $233,773.

[27] In any event, even though the court didn't include the 2024 proceeds in its determination of Father's weekly gross income, it still provided a mechanism to incorporate any irregular income into Father's support obligation—it ordered the parties to perform an annual "true up" whereby Father will have to verify his income for the previous year, and that amount will be used to determine his support obligation. This mechanism satisfies the Guidelines' requirement that support reflect dependable income. By anchoring the base obligation to Father's current earnings while building in annual reconciliation, the court accounted for irregular income without inflating the weekly obligation with a one-time windfall. The trial court did not err in calculating Father's income for purposes of modifying his support obligation.

## C. The trial court did not abuse its discretion in ordering the parties to pay their own attorney's fees

[28] Mother also contends that the trial court erred in ordering the parties to pay their own attorney's fees instead of ordering Father to pay her attorney's fees. In post-dissolution proceedings, the trial court may order a party to pay a reasonable amount toward the opposing party's attorney's fees. *Van Wieren v. Van Wieren*, 858 N.E.2d 216, 224 (Ind. Ct. App. 2006); *see also Reel v. Reel*, 231 N.E.3d 915, 925-26 (Ind. Ct. App. 2024) ("Indiana Code Section 31-17-7-1 . . . allows the award of attorney's fees in post-dissolution cases . . . ."). "When making such an award, the court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income and other factors that bear on the reasonableness of the award." *Hendricks v. Hendricks*, 784 N.E.2d 1024, 1028 (Ind. Ct. App. 2003). The decision to grant or deny attorney's fees is left to the sound discretion of the trial court, and a decision to deny attorney's fees will be reversed only for an abuse of discretion. *Van Wieren*, 858 N.E.2d at 224.

[29] Mother argues that in light of the trial court's finding that "[t]here is a very large disparity in gross weekly income in Father's favor," Appellant's App. Vol. 3 p. 106, the court should have ordered Father to "pay all or a substantial portion" of her attorney's fees under Section 31-17-7-1, Appellant's Br. p. 53.[2] But "the

---

[2] Mother makes this same argument under Section 31-17-7- 1 as to the GAL fees, parenting-coordinator fees, uninsured medical expenses, and tutoring and camp costs. But Section 31-17-7-1 doesn't apply to these expenses; it concerns only awards for the cost of maintaining and defending an action, attorney's fees, and mediation services. GAL fees are governed by Indiana Code section 31-17-6-9, and costs like tutoring, camp,

economic condition of the parties is only one factor bearing on the reasonableness of a fee award." *Reel*, 231 N.E.3d at 926. Indeed, "misconduct that directly results in additional litigation expenses may be properly taken into account in the trial court's decision to award attorney's fees." *Hendricks*, 784 N.E.2d at 1028. The trial court here found:

> Mother caused an increase in fees by first representing herself, then withdrawing her request to modify school choice only to re-file the same about 5 months later. Mother caused an additional increase in fees by failing to properly follow the relocation statute. Father incurred significant attorney fees seeking discovery, efforts which resulted in 2 separate orders compelling Mother to respond. Mother was found in contempt for involving the children in the school choice dispute.

Appellant's App. Vol. 3 p. 106. In light of these facts, the trial court acted within its discretion in declining to award fees to either party. The court did not abuse its discretion in ordering the parties to pay their own attorney's fees.

## D. The trial court did not abuse its discretion in finding Mother in contempt

[30] Finally, Mother argues that the trial court erred in finding her in contempt for involving the children in the school-choice dispute. Generally, a person who willfully disobeys an order lawfully issued by the court of record or the proper

---

uninsured medical expenses, and parenting-coordinator fees are covered by the Indiana Child Support and Parenting Time Guidelines. *See* Ind. Child Support Guidelines 7-8; Ind. Parenting Time Guideline V(C)(6). Mother doesn't cite any of these authorities. Because the sole basis for her challenge to the trial court's allocation of GAL fees, parenting-coordinator fees, uninsured medical expenses, and tutoring and camp costs is Section 31-17-7-1, which doesn't apply, this part of Mother's argument is without merit.

officer of the court is guilty of indirect contempt. *See* I.C. § 34-47-3-1; *Henderson v. Henderson*, 919 N.E.2d 1207, 1210 (Ind. Ct. App. 2010). "It is soundly within the discretion of the trial court to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).

[31] GAL Harrington noted in her 2024 report that the children were "placed in the middle of an adult decision" because Mother shared her negative opinions about Avon schools with them. In its order on the November 7, 2024 hearing, the trial court admonished the parties "not to have any discussions with [the] children regarding the pending motions, school choice, custody, parenting time or other adult matters related to the ongoing issues in this case." The court included this same admonition in its order on the January 17, 2025 hearing.[3] Before the court ruled on Mother's request to remove the children from Avon schools, Mother sold the marital home in Avon and moved to the Washington Township school district. Mother admitted that around the start of the 2024-2025 spring semester, she took the children to a Washington Township school with the intention of enrolling them, but the school was closed that day. She also acknowledged that she'd made comments to them about "the lack of appropriate interventions" at Avon schools. GAL Harrington testified that the

---

[3] In her reply brief, Mother argues that the January 2025 order was not sufficiently clear. *See, e.g.*, *Deel v. Deel*, 909 N.E.2d 1028, 1032 (Ind. Ct. App. 2009) ("A party may not be held in contempt for failing to comply with an ambiguous or indefinite order."). But Mother didn't challenge the clarity of the January 2025 order in her opening brief, so this argument is waived. *See Naville v. Naville*, 818 N.E.2d 552, 553 n.1 (Ind. Ct. App. 2004) ("A party may not raise an argument for the first time in its reply brief.").

children "are very involved in knowing what's happening in the education realm," "they talk about how they're at the wrong school, and they know that [Mother] is trying to get them out of Avon." And GAL Harrington explained that "Mother has created difficult relationships with teachers and staff at [Avon Community School Corporation]," which "demonstrates to the Children her disapproval of their schools." All these facts support the trial court's finding that Mother involved the children in the school-choice dispute. The court did not abuse its discretion in finding Mother in contempt.

## II. Father's Cross-Appeal

[32] On cross-appeal, Father argues that the trial court erred in ordering fully joint legal custody rather than granting him sole legal custody as to educational decisions. At the outset, Mother contends that legal custody was "not properly at issue under the pleadings" because Father never petitioned for modification of legal custody. Appellant's Br. p. 30. But under Trial Rule 15(B), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

[33] Father requested that the trial court modify the parties' custody arrangement in his November 1, 2024 objection to Mother's improper notice of relocation, *see* Appellee's App. Vol. 2 p. 104, his December 23, 2024 motion for a temporary injunction, *see id.* at 120, and his February 7, 2025 notice of intent to relocate, *see id.* at 156. GAL Harrington recommended in her supplemental report and at the July 2025 hearing that Father be awarded sole legal custody with respect to

education. At the hearing, Father requested sole legal custody as to educational decisions and joint legal custody as to all other matters. And Mother testified about what she's "afraid of if [Father] is given legal custody regarding the girls['] educational decisions." Tr. Vol. 2 p. 144. Clearly, the issue of modification of legal custody was tried by consent of the parties and thus is properly before us for review. *See Ellenburg v. Kropp*, 175 N.E.3d 1208, 1212 (Ind. Ct. App. 2021) ("Father's pleadings . . . sufficiently place the issue of legal custody before the court. . . . In addition, the parties presented arguments and evidence which put into question the issue of legal custody."), *trans. denied*.

[34] As noted above, we review a custody modification for an abuse of discretion. *McDaniel*, 150 N.E.3d at 288. We will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.* A trial court may award joint legal custody if the court finds that such an award "would be in the best interest of the child." I.C. § 31-17-2-13. In determining whether an award of joint legal custody is in the best interest of the child, the court shall consider:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

    (A) live in close proximity to each other; and

    (B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15. The second factor—whether the parents are willing and able to communicate and cooperate in advancing the child's welfare—is particularly important in making a legal-custody determination. *Rasheed v. Rasheed*, 142 N.E.3d 1017, 1022 (Ind. Ct. App. 2020), *trans. denied*. Where the parties have made child-rearing a battleground, joint legal custody is not appropriate. *Id.* Therefore, while we are reluctant to reverse a trial court's grant of joint legal custody, "we will do so when the evidence indicates a clear abuse of trial court discretion in that the joint custody award constitutes an imposition of an intolerable situation upon two persons who have made child rearing a battleground." *Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (quotation omitted).

[35] Here, the trial court found that modifying legal custody to joint is in the children's best interests. But because Mother and Father have made child-rearing—specifically the children's schooling—a battleground, an award of joint

legal custody as to educational decisions imposes an intolerable situation upon them. As the trial court noted, "Throughout the history of this case, the parties have had significant and repeated problems communicating and effectively co-parenting." Appellant's App. Vol. 3 p. 92. GAL Harrington, who's worked with the parties since the dissolution proceedings began, described Mother and Father as "oil and water." Tr. Vol. 2 p. 28. She concluded that they can't make joint decisions about the children's education and accordingly recommended that Father be awarded sole legal custody with respect to educational decisions. The court remarked during the July 2025 hearing that Mother and Father's relationship has "never been" a successful coparenting arrangement and that awarding joint legal custody "seems a[nti]thetical to what joint legal custody is about." The court also commented that a parenting coordinator "works in just a very small percentage of cases," usually "in cases where parties are willing to change, because you have to have a heart change before there's a head change. And I see no heart change here." Yet despite these observations, the court concluded that Mother and Father having joint legal custody while working with a parenting coordinator is in the children's best interests. With respect to education, this decision was clearly against the logic and effect of the facts and circumstances before the court—especially given that the children will be remaining in Avon schools, and the court found that "Mother's relationship with Avon Schools has completely broken down and [is] likely irreconcilable." Appellant's App. Vol. 3 p. 94. The trial court abused its discretion in awarding joint legal custody as to education.

[36] Instead, the evidence supports Father having sole legal custody as to educational decisions. Special Education Director Hurt testified that Father had been collaborative with the children's schools, and she believed she could work with him to continue implementing services for the children. But Hurt couldn't say the same for Mother. GAL Harrington recommended that Mother not be allowed to participate in school-related decisions because "Mother has created difficult relationships with teachers and staff at [Avon Community School Corporation]" which "cannot be repaired." As detailed above, Mother has thwarted Avon's efforts to help S.G., P.G., and L.G. And although G.G. was supposed to be in kindergarten for the 2024-2025 school year, Mother later decided not to start her in school for another year. GAL Harrington opined that this was "absolutely the incorrect decision" because G.G. being the oldest student in her class will "have such a psychological impact on her." And before the court ruled on Mother's request to remove the children from Avon schools, she sold her home in Avon, moved to Washington Township, and tried to enroll the children there. Mother has shown that she is not willing or able to cooperate in advancing the children's welfare as it relates to education. Accordingly, an award of joint legal custody as to educational decisions is not in the children's best interests.

[37] Father requested (and GAL Harrington recommended) sole legal custody only with respect to educational decisions. Although Mother and Father have problems communicating and coparenting, because there is insufficient evidence in the record of conflicts as to other matters (such as health care or

religion), we cannot say the trial court abused its discretion in awarding joint legal custody entirely. We therefore reverse the award of joint legal custody as to educational decisions only, affirm joint legal custody as to non-educational matters, and remand with instructions for the trial court to award sole legal custody to Father with respect to education.

[38] Affirmed in part, reversed in part, and remanded.

Bailey, J., and Scheele, J., concur.

APPELLANT/CROSS-APPELLEE PRO SE

Jennifer Lynn Goetz
Indianapolis, Indiana

ATTORNEY FOR APPELLEE/CROSS-APPELLANT

Melinda O'Dell
O'Dell Family Law, LLC
Brownsburg, Indiana